UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROCKY DEFILIPPO,

                          Plaintiff,

          -v.-                                    17 Civ. 2789 (KPF)

NATIONAL RAILROAD PASSENGER              **OPINION AND ORDER**
CORPORATION and ABM JANITORIAL
SERVICES NORTHEAST, INC.,

                          Defendants.

KATHERINE POLK FAILLA, District Judge:

Plaintiff Rocky DeFilippo brought claims under the Federal Employers'
Liability Act ("FELA"), 45 U.S.C. §§ 51-60, for injuries suffered at his workplace.
Initially, he named only his employer, the National Railroad Passenger
Corporation ("Amtrak"), as a defendant. Later, Plaintiff brought claims for
negligence against the janitorial services company, ABM Janitorial Services
Northeast, Inc. ("ABM"), which he asserts contributed to his injury. Amtrak
then asserted cross-claims against ABM for indemnification.

ABM now moves for summary judgment on Plaintiff's claim for negligence
and Amtrak's cross-claim for indemnification. For the reasons set forth in this
Opinion, the Court denies ABM's motion in full.

# BACKGROUND[1]

## A.    Factual Background

### 1.    The Parties

Plaintiff Rocky DeFilippo is a resident of Mastic, New York. (DeFilippo 12/5/17 Dep. 5:10-11). At the time of the incident giving rise to this litigation, Plaintiff was employed by Amtrak as a police officer at New York's Penn Station (the "Station"). (*Id.* at 25:2-7). Amtrak maintains tracks and yards within the Southern District of New York. (Am. Compl. ¶ 2). Defendant ABM is a janitorial services company based in New York that provides services to Amtrak. (*Id.* at ¶ 10).

---

[1]    The facts stated herein are drawn from the parties' submissions in connection with the instant motion, including ABM's Local Rule 56.1 Statement ("ABM 56.1" (Dkt. #82)), as well as Plaintiff's ("Pl. 56.1" (Dkt. #84)) and Amtrak's ("Amtrak 56.1" (Dkt. #87)) counterstatements. References to individual deposition transcripts, declarations, and affidavits are referred to using the conventions "[Name] [Date] Dep.," "[Name] Decl.," and "[Name] Aff.," respectively. The Court refers separately throughout to two elements of the contract between Amtrak and ABM: the National Railroad Passenger Corporation (Amtrak) Services Contract General Provisions (the "Services Contract") and the "Housekeeping & Janitorial Services Specification" (the "Janitorial Contract"), both of which are provided as parts of Exhibit Q to the Affirmation of Richard A. Soberman. (Dkt. #78-20 at 8-24, 29-62). For ease of reference, ABM's opening brief is referred to as "ABM Br." (Dkt. #78); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #83); Amtrak's opposition brief as "Amtrak Opp." (Dkt. #88); and Richard A. Soberman's Reply Affirmation in Further Support of the Motion for Summary Judgment as "ABM Reply" (Dkt. #89).

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

## 2.    The Janitorial Contract Between ABM and Amtrak

During the relevant time period, ABM had a contract with Amtrak to provide janitorial services at the Station.  (ABM 56.1 ¶ 1; Amtrak 56.1 ¶ 9). Under the contract, ABM agreed to provide staffing twenty-four hours a day, seven days a week, at specified locations in the Station, including the Amtrak Police Department's break room (the "Break Room").  (Pl. 56.1 ¶ 3; Amtrak 56.1 ¶ 10).  ABM was responsible for routine cleaning of the Break Room, which included removing spills from time to time and providing additional cleaning as necessary.  (Amtrak 56.1 ¶¶ 11-12; Janitorial Contract 9).

ABM employees worked in three different shifts that covered the 24-hour period: generally (and approximately) speaking, the first shift spanned from 7:00 a.m. until 3:30 p.m. (the "First Shift"); the second shift spanned from 3:00 p.m. until 11:30 p.m. (the "Second Shift"); and the third shift spanned from 11:00 p.m. until 7:30 a.m. (the "Third Shift").  (Janitorial Contract 10).  Of potential significance to the instant motion, ABM porters performed routine cleaning in the Break Room only during the Second and Third Shifts.  (Garcia Aff. ¶ 2; *see also* Janitorial Contract 25-26, 29).  In other words, ABM porters did not ordinarily enter or perform any work in the Break Room during the First Shift unless specifically requested to do so.  (Garcia Aff. ¶ 2).

ABM porters were required to report leaks and other hazardous conditions they noticed to their ABM supervisor, who in turn was to report the issue to the Amtrak Stationmaster.  (Amtrak 56.1 ¶ 15).  ABM porters were also required to take measures to secure an affected area, such as placing a bucket

to catch leaks and/or placing a yellow caution sign to warn of the condition. (*Id.*).

The Indemnification Clause of ABM's Services Contract with Amtrak provides, in pertinent part:

> [ABM] agrees to defend, indemnify and hold harmless Amtrak, its officers, directors, employees, agents, successors, assigns and subsidiaries (collectively "Indemnified Parties"), from and against any claims, losses, liabilities (including without limitation environmental liabilities), penalties, fines, causes of actions, suits, costs and expenses incidental thereto, (including costs of defense and attorneys' fees) (collectively "Claims"), which any of the Indemnified Parties may hereafter incur, be responsible for or pay as a result of breach of warranty, injury or death of any person, … arising out of or in any degree directly or indirectly caused by or resulting from materials or deliverables supplied by, or from activities of, or Services performed by [ABM], [ABM]'s officers, employees, agents, subcontractors, or any other person acting for or with the permission of [ABM] under the Contract, or as a result of [ABM]'s failure to perform its obligations in compliance with the Contract Documents.

> In addition to the foregoing, [ABM] agrees to defend, indemnify and hold harmless the Indemnified Parties, from and against any Claims which any of the Indemnified Parties may hereafter incur, be responsible for or pay as a result of injuries (including death) to any of [ABM's] employees, agents or subcontractors.

> The indemnification obligations under this section shall not be limited by the existence of any insurance policy procured or maintained by [ABM] or by any limitation on the amount or type of damages, compensation or benefits payable by or for [ABM] or any subcontractor and shall survive the termination of the [ABM].

(Services Contract ¶ 24.A-.C).

### 3. The Condition of the Break Room

Plaintiff's accident occurred on Monday, December 19, 2016. The parties dispute who, if anyone, was aware of dangerous conditions in the Break Room immediately prior to the accident.

### a. Break Room Conditions Generally

ABM porter Cepada Vicente testified that water leaks would frequently occur inside the Break Room during heavy rain storms. (Sokoloff Aff. ¶ 8). Vicente was also aware that ceiling tiles inside the Break Room would fall when the ceiling was leaking, and he had observed missing tiles in the ceiling. (*Id.* at ¶ 9). Plaintiff confirmed that Amtrak police officers reported the conditions of the ceiling in the Break Room "all the time" to Amtrak bosses, unions, and the safety committee. (DeFilippo 12/05/17 Dep. 38:2-22).

### b. Saturday, December 17, 2016

On Saturday, December 17, 2016, a snow storm hit New York City and continued through the weekend. (Sokoloff Aff. ¶¶ 3-4). Vicente, who was working the First Shift that day between 6:30 a.m. and 2:30 p.m., was directed to mop the floor of the Break Room "a couple of times[.]" (*Id.* at ¶¶ 2, 5). Vicente testified that he would be directed to mop the Break Room only when the ceiling was leaking. (*Id.* at ¶ 5). When Vicente entered the Break Room, he noticed that there was a yellow bucket on the ground to catch the water leaking from the ceiling. (*Id.* at ¶ 6). ABM used similar yellow buckets. (*Id.*).[2]

---

[2] Plaintiff also saw a rust-colored bucket on the floor the night before the accident. (DeFilippo 6/29/18 Dep. 98:21-100:3).

ABM manager Paul Mrnacaj was on duty at the Station that day during the Second Shift, from 2:30 p.m. until 10:30 p.m (Pl. 56.1 ¶ 4), but neither Mrnacaj nor Vicente notified the Amtrak station manager of the ceiling leaking (Sokoloff Aff. ¶ 2).

### c. Sunday, December 18, 2016, to the Morning of the Accident

On Sunday, December 18, 2016, ABM porter Rizvan Caushi was the foreman of the Third Shift, which spanned from 10:30 p.m. that day until 6:30 a.m. on December 19, 2016.  (Amtrak 56.1 ¶ 16).  Caushi testified that he last entered the Break Room at around 5:00 a.m. on December 19, 2016, and, further, that he did not see a metal bar on the floor of the Break Room at that time.  (*Id.*).  ABM porter Sazan Xhelo also worked the Third Shift on December 18-19, 2016.  (Amtrak 56.1 ¶ 17).  He recalled entering the Break Room between 2:00 a.m. and 2:30 a.m., and a second time at around 4:00 a.m. (*Id.*).  Xhelo was in the Break Room for approximately 20 to 30 minutes each time and did not see a metal bar on the floor either time.  (*Id.*).

No ABM employees who worked the First Shift on Monday, December 19, 2016, from 6:30 a.m. to 2:30 p.m., admitted to entering the Break Room at any time during their shifts.  (Amtrak 56.1 ¶ 18).  Under the Contract with Amtrak, the first time that an ABM porter, foreman, or supervisor was scheduled to enter the Break Room that day was during the Second Shift later that afternoon.  (Janitorial Contract 29).

### 4.    The December 19, 2016 Accident

Plaintiff recalled that he was working a Sunday night to Monday morning shift, beginning at 10:45 p.m. on December 18, 2016, and ending at 9:00 a.m. on December 19, 2016.  (Amtrak 56.1 ¶ 1).  Plaintiff worked overtime that day and entered the Break Room to eat his lunch at around 11:00 a.m.  (*Id.*).  He walked around a table to take his lunch from the refrigerator, and when he turned back toward the table he stepped on a piece of metal on the floor.  (*Id.* at ¶ 2; ABM 56.1 ¶ 4).  Plaintiff hit his right arm on the table and landed on the left side of his body.  (*Id.* at ¶ 2).  There was no one else in the Break Room when the accident occurred.  (*Id.*).

Plaintiff states that he did not see the metal bar before he stepped on it. (DeFilippo 6/29/18 Dep. 92:24-93:1).  He did not know how long the metal bar had been on the floor of the Break Room before the accident.  (ABM 56.1 ¶ 8). The last time Plaintiff had entered the Break Room before the accident was sometime before 10:45 p.m. on Sunday night, when he put food in the refrigerator, and at that time he did not notice any unsafe floor conditions. (DeFilippo 6/29/18 Dep. 97:21-98:21; Amtrak 56.1 ¶ 3).  Plaintiff contends that the metal bar on the floor appeared to have fallen from the ceiling. (Amtrak 56.1 ¶ 2).  He did not recall the floor being wet when he entered the Break Room.  (ABM 56.1 ¶ 3).

Immediately after the accident, Plaintiff called his supervisor, Sergeant Mark Herman, who came to the Break Room within "moments."  (Amtrak 56.1 ¶ 5; Herman Dep. 32:4-24).  Plaintiff gave a verbal report, known as an

"Employee Personnel Statement," to Sgt. Herman and told him how the accident had happened. (ABM 56.1 ¶¶ 5-6). Sgt. Herman then completed an "Employee Injury Report" (the "Injury Report") that same day. (Dkt. #86-5). Sgt. Herman observed some missing ceiling tiles and water on the floor of the Break Room. (Amtrak 56.1 ¶ 5). He also noted in the Injury Report that the "floor [was] wet due to recent rain and/or snow activity and that the floor "appeared to have been recently mopped removing excess water." (Injury Report 5-6). Sgt. Herman surmised that the floor had been recently mopped based on the water being in certain configurations in some areas and pooled in others. (Herman Dep. 37:20-38:12). No Amtrak police officers or other Amtrak Police Department personnel were assigned to mop the Break Room. (Amtrak 56.1 ¶ 8).

## B.   Procedural Background

On April 18, 2017, Plaintiff filed his Complaint against Amtrak, alleging FELA violations for injuries sustained when he fell in the Break Room at the Station. (Dkt. #1). Amtrak filed an answer on May 19, 2017. (Dkt. #8).

On December 15, 2017, Plaintiff filed a letter motion for leave to join ABM to his case. (Dkt. #25). The Court held a pre-motion conference on February 21, 2018, during which the Court granted leave for Plaintiff to amend his Complaint. Plaintiff filed his Amended Complaint on March 9, 2018, joining ABM as an additional Defendant. (Dkt. #40).

On April 4, 2018, ABM filed its answer to the Amended Complaint, along with a cross-claim against Amtrak. (Dkt. #49). On April 25, 2018, Amtrak

filed its answer to the Amended Complaint, asserted counterclaims against Plaintiff and cross-claims against ABM, and filed a separate answer to ABM's cross-claims. (Dkt. #53, 54). ABM filed its answer to Amtrak's cross-claims on April 27, 2018, and Plaintiff filed his answer to Amtrak's counterclaims on June 6, 2018. (Dkt. #56, 57).

ABM filed the instant motion for summary judgment on November 16, 2018. (Dkt. #78). On January 9, 2019, ABM filed its memorandum of law, Rule 56.1 Statement, and supporting affirmation of Richard A. Soberman. (Dkt. #80-82). On January 10, 2019, Plaintiff filed his memorandum of law, Rule 56.1 Statement, and opposing affidavit of Mark G. Sokoloff. (Dkt. #83-85). On January 10, 2019, Amtrak filed its memorandum of law, Rule 56.1 Statement, and opposing declaration of Ronald E. Joseph. (Dkt. #86-88). ABM filed its reply, in the form of a second affirmation from Soberman, on January 24, 2019. (Dkt. #89). The motion is now fully briefed.

## DISCUSSION

### A. Applicable Law

#### 1. Summary Judgment Under Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[3] A fact

---

[3] The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. See Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting

is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing Anderson).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party failed to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *see also Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party

that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

"must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, in considering "what may reasonably be inferred" from witness testimony, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *Cty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).[4]

### 2. Negligence Law Generally

Plaintiff brings a claim in connection with Defendants' alleged negligent supervision, maintenance, and/or inspection of the workplace. Proving negligence under New York law requires demonstrating three elements: "(i)the existence of a duty owed by the defendant to the plaintiff; (ii) a breach thereof; and (iii) injury proximately resulting therefrom." *Lerner* v. *Fleet Bank, N.A.*, 459

---

[4]     ABM cites to the summary judgment standard of the United States Court of Appeals for the District of Columbia Circuit. (*See* ABM Br. 3-4). There is no meaningful difference between the law of the D.C. and Second Circuits in this regard.

F.3d 273, 286 (2d Cir. 2006) (internal quotation marks omitted).  ABM disputes

both that it owed a duty to Plaintiff and that it breached any duty.

**B.      Summary Judgment Is Denied as to Plaintiff's Negligence Claims Against ABM**

      **1.      ABM Owed a Duty to Plaintiff as a Matter of Law**

Under New York law, a negligence action must fail where "the defendant

owes no duty to the plaintiff."  *Darby* v. *Compagnie Nat'l Air France*, 96 N.Y.2d

343, 347 (2001).[5]  "Although juries determine whether and to what extent a

particular duty was breached, it is for the courts first to determine whether any

duty exists."  *Id.*  ABM alleges that it did not owe a duty to Plaintiff, since

Plaintiff was a not a party to the Contract between ABM and Amtrak, and that

no additional factor suggests that ABM owed a duty to Plaintiff.  (*See* ABM

Br. 5-6).

"In the ordinary case, a contractual obligation, standing alone, will

impose a duty only in favor of the promisee and intended third-party

beneficiaries[.]"  *Eaves Brooks Costume Co.* v. *Y.B.H. Realty Corp.*, 76 N.Y.2d

220, 226 (1990).  Thus, a contractor generally does not owe an independent

duty of care to a non-contracting third party.  *Espinal* v. *Melville Snow*

*Contractors Inc.*, 98 N.Y.2d 136, 138 (2002).  However, the New York Court of

Appeals has identified

> three situations in which a party who enters into a
> contract to render services may be said to have
> assumed a duty of care — and thus be potentially liable
> in tort — to third persons: (i) where the contracting

---

[5]      The parties do not dispute that New York law governs Plaintiff's negligence claims.  (*See* ABM Br. 4; Pl. Opp. 4).

party, in failing to exercise reasonable care in the performance of his duties, 'launche[s] a force or instrument of harm'; (ii) where the plaintiff detrimentally relies on the continued performance of the contracting party's duties; and (iii) where the contracting party has entirely displaced the other party's duty to maintain the premises safely.

*Id.* at 140 (internal citations omitted). This Court concludes that Plaintiff has demonstrated ABM's duty to him based on ABM's assumption of the duty to provide and maintain safe premises to Amtrak employees at the Station.

As both Amtrak and Plaintiff argue, New York courts have made clear that contractors take on a duty to third parties where they have assumed obligations to maintain premises. (*See* Pl. Opp. 4-5; Amtrak Opp. 5-6). In *Palka* v. *Servicemaster Management Services Corp.*, the New York Court of Appeals found a maintenance provider owed a duty to third parties, as "a known and identifiable group … was to benefit and be protected by safety maintenance protocols assumed and acquired exclusively by [the defendant]. [Defendant could not] reasonably claim that it was unaware … that individuals would expect [it] to perform maintenance services with ordinary prudence and care." 83 N.Y.2d 579, 589 (1994). So too here: ABM's contract with Amtrak specified a 24-hour comprehensive maintenance service. (Janitorial Contract 10-14). What is more, ABM was aware of the identifiable group of individuals who would benefit from maintenance — Amtrak customers and employees. For this reason, several New York courts have recognized this exception in the janitorial context. *See, e.g.*, *Torres* v. *Merrill Lynch Purchasing*, 945 N.Y.S.2d 78, 79 (1st Dep't 2012) ("[T]he janitorial contract gave ABM

Janitorial exclusive control over cleaning in the area where plaintiff allegedly slipped and fell, which was sufficient to impose upon it a duty of care toward the noncontracting plaintiff[.]"); *Riley* v. *ISS Int'l Serv. Sys., Inc.*, 774 N.Y.S.2d 182, 184-85 (2d Dep't 2004) ("[T]he comprehensive and exclusive contractual obligation of ISS to provide cleaning services in the relevant area of the building is sufficient to support a duty of care running to the [noncontracting] plaintiff.").

In response, ABM argues that Amtrak and ABM read *Palka* too broadly, especially in light of the New York Court of Appeals' subsequent decision in *Espinal.* (*See* ABM Reply ¶ 48). In particular, ABM argues that "Amtrak has not relinquished its control over the management, operation, maintenance and repair of Penn Station. Its in-house 'B&B' division still takes care of all of that. ABM just provides a janitorial staff and does the cleaning." (*Id.*). The Court finds that ABM offers an unduly cramped view of the duty owed by contractors under New York law. Notably, ABM does not address *Torres* or *Riley*, discussed above, both of which explicitly held that a janitorial contract to provide exclusive cleaning services in a portion of a building can create duties to the third-party users of those spaces.

To be sure, the New York Court of Appeals did find in *Espinal* that a snow plow operator was not liable to an individual employee of the company with which it contracted to remove snow from a parking lot. 98 N.Y.2d at 141-42. However, the Court based its finding on "the express terms of the contract, [by which] Melville was obligated to plow only when the snow accumulation

14

had ended and exceeded three inches," and specifically contrasted that contract with the "'comprehensive and exclusive' property maintenance obligation contemplated by *Palka*." *Id.* at 141.

This Court has examined the Contract at issue here, which calls for continuous maintenance and staffing by a minimum of sixty-three employees and five managers (*see* Janitorial Contract 10-11), and finds that it far more closely resembles the comprehensive property maintenance obligations in *Palka* than the conditional snow-removal obligations in *Espinal*. The testimony of ABM's employees confirms that ABM was responsible for reporting hazardous conditions to Amtrak. (Amtrak 56.1 ¶ 15). From these findings, the Court concludes that ABM owed a duty of care to Amtrak employees, such as Plaintiff, who ABM could foresee would rely on its satisfactory performance of its contractual obligations. If ABM had notice, either actual or constructive, of the damage to the Break Room ceiling (and the corresponding propensity of items, such as the metal bar, to fall from the ceiling of the Break Room) and failed to report it to Amtrak, and if this failure led to Plaintiff's injury, ABM would be liable for negligence.

### 2. Plaintiff Has Raised a Genuine Dispute of Fact Regarding Whether ABM Had Notice of a Dangerous Condition

To establish negligence in a slip-and-fall premises liability case, a plaintiff must demonstrate "the existence of a dangerous or defective condition, and that the defendant either created the condition or had actual or constructive notice of it and failed to remedy it within a reasonable time." *Winder* v. *Exec. Cleaning Servs., LLC*, 936 N.Y.S.2d 687, 688 (2d Dep't 2012).

The parties do not dispute that the metal bar on the floor of the Break Room was a dangerous condition, and Plaintiff does not allege that ABM created the condition. (*See* Pl. Opp. 8). Under New York law, liability depends on whether ABM had actual or constructive notice of the condition and failed to remedy it. *See Colt* v. *Great Atl. & Pac. Tea Co. Inc.*, 618 N.Y.S.2d 721, 722 (1st Dep't 1994). The Court finds that triable issues of fact remain with respect to both actual and constructive notice.

### a. A Genuine Dispute of Fact Exists Regarding ABM's Actual Notice of the Condition

Plaintiff alleges in the first instance that ABM had actual notice of the unsafe ceiling condition in the Break Room that caused items to fall. (*See* Pl. Opp. 4). "A defendant has actual notice if it either created the condition or received reports of it such that it is actually aware of the existence of the particular condition that caused the fall." *Decker* v. *Middletown Walmart Supercenter Store*, No. 15 Civ. 2886 (JCM), 2017 WL 568761, at *6 (S.D.N.Y. Feb. 10, 2017) (quoting *Cousin* v. *White Castle Sys., Inc.*, No. 06 Civ. 6335 (JMA), 2009 WL 1955555, at *7 (E.D.N.Y. July 6, 2009)).

ABM argues that it did not know about the particular condition that caused Plaintiff's injury, i.e., the metal bar that Plaintiff tripped over. (*See* ABM Reply ¶¶ 9, 42-44). During the Third Shift on December 18-19, 2016, neither the ABM porter, Sazan Xhelo, nor his foreman, Rizvan Caushi, saw a metal bar on the floor of the Break Room when they entered it. (*See* ABM

Br. 7).[6]  Caushi states that he inspected the Break Room at 5:00 a.m. on the

morning of the accident and did not see a metal bar on the floor at that time.

(*See id.*).  Accordingly, ABM contends that the only triable issue of fact is

whether or not an ABM porter entered the Break Room on December 19, 2016,

and mopped the floor before Plaintiff tripped on the metal bar.  (*See* ABM Reply

¶ 42).  Having framed the issue, ABM then carefully frames its response:  It

argues that no ABM employee entered the room because ABM porters have no

---

[6]  Amtrak objects to the affidavits of three ABM employees, Sazan Xhelo, Rene Garcia, and Rizvan Caushi.  (*See* Amtrak Opp. 7).  ABM acknowledges that none of these three individuals was ever formally identified pursuant to Fed. R. Civ. P. 26(a) or (e).  (ABM Reply ¶ 37).

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless.  Fed. R. Civ. P. 37(c)(1).  The mere mention of a name in a deposition or interrogatory response is insufficient to satisfy Rule 26(a)(1)(A)(i).  *See Xiao Hong Zheng* v. *Perfect Team Corp.*, 739 F. App'x 658, 660 (2d Cir. 2018) (summary order).  To determine whether preclusion of testimony under Rule 37 is an appropriate sanction for failure to meet disclosure requirements, the Second Circuit uses a four-factor test.  *Dynamic Concepts, Inc.* v. *Tri-State Surgical Supply & Equip. Ltd.*, 716 F. App'x 5, 7 (2d Cir. 2017) (summary order).  Those factors are: (i) the party's explanation for the failure to comply with the discovery order; (ii) the importance of the testimony of the precluded witness; (iii) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (iv) the possibility of a continuance.  *Id.*

ABM contends that it only became aware of these three employees when it started to prepare ABM's motion for summary judgment.  (*See* ABM Reply ¶ 38).  It states that the failure was an "inadvertent oversight" and points out that Amtrak's records partially identify two of the three ABM employees.  (*Id.* at ¶ 39).  The Court finds these explanations lacking.  ABM's explanation of "inadvertent oversight" is not compelling.  Given that ABM bases much of its argument on these affidavits, which were newly introduced at the summary judgment stage, the second and third factors weigh against ABM.  The "mere mention of these names" in certain documents possessed by its adversaries does not eliminate ABM's responsibility to identify its own employees, who would serve as witnesses.

As it happens, the Court finds that consideration of these documents would not affect its ultimate decision and, therefore, has incorporated them into its analysis in the interest of completeness.  The Court will consider at a later date whether these individuals will be permitted to testify at trial and/or whether their late appearance necessitates further discovery.

duty to perform any work in the Break Room during the First Shift absent a request. (*See id.* at ¶¶ 13, 44-45).

Plaintiff and Amtrak counter that ABM had actual knowledge of *both* the recurring water leaks in the ceiling above the Break Room and the deterioration of the ceiling tiles when they became waterlogged due to the leaks. (*See, e.g.*, Plaintiff Opp. 6; Amtrak. Opp. 6). ABM was aware of the ceiling leak before the accident, as demonstrated by ABM porter Vicente's testimony that (i) he was directed to mop the floor of the Break Room "a couple of times" prior to December 19, 2016 (Vicente Dep. 21:5-19), and (ii) he had seen a yellow bucket placed on the floor to catch water leaking from the ceiling (*id.* at 17:19-19:5). Vicente was also aware that ceiling tiles inside the Break Room would fall when the ceiling was leaking and had observed missing tiles in the ceiling. (*Id.* at 26:25-27:5). Additionally, Sgt. Herman's Injury Report makes clear that the floor appeared to have been recently mopped at or about the time of the accident. (Injury Report 5-6). And, as noted, no one from Amtrak was assigned to mop the Break Room. (Amtrak 56.1 ¶ 8). From this, Plaintiff and Amtrak argue that a genuine dispute of fact exists whether ABM was actually aware of the Break Room's condition. The Court agrees.

The question of notice is a fact-intensive one, one uniquely unsuited for summary judgment. The Court recognizes that ABM has provided numerous declarations attesting to a lack of knowledge on the part of its personnel of the bar on the floor or the propensity for leaks during the rain. (ABM Reply ¶ 50). However, these declarations do not resolve the notice issue as a matter of law.

Sgt. Herman's analysis of the scene of the accident, conducted just minutes after the accident, is entitled to a weight that the temporally-removed declarations of ABM employees lack. Furthermore, Sgt. Herman provided a reasoned explanation for why he concluded that the floor had recently been mopped. (Herman Dep. 37:20-38:12). Accordingly, evidence in the record suggests that ABM employees were in the Break Room shortly before the accident occurred, when the bar was already on the ground. ABM's employee Vicente testified that he was aware that the ceiling leaked, causing tiles to deteriorate, suggesting that ABM was aware that items might fall from the roof. In sum, while ABM may have provided some evidence that no employees were aware of the fallen bar or damaged roof, there is enough evidence in the record to require a jury determination on the issue of actual notice.

### b. A Genuine Dispute of Fact Exists Regarding ABM's Constructive Notice of the Condition

Plaintiff also alleges that ABM had constructive notice of the metal bar on the floor. (*See* Pl. Opp. 8). "To constitute constructive notice, a defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." *Gordon* v. *Am. Museum of Nat. History*, 67 N.Y.2d 836, 837 (1986) (internal quotation marks omitted). "In cases where the plaintiff is unable to establish how long the condition causing the accident existed prior to the accident, courts have entered summary judgment in favor of the defendant." *Stephanides* v. *BJ's Wholesale Club, Inc.*, No. 12 Civ. 83 (CLP), 2013 WL 1694901, at *5 (E.D.N.Y. Apr. 18, 2013) (citing *Gordon*, 67 N.Y.2d at 837).

The record evidence of actual notice just discussed presents an even stronger case for constructive notice. "When a landowner has actual knowledge of the tendency of a particular dangerous condition to reoccur, he is charged with constructive notice of each specific reoccurrence of that condition." *Weisenthal* v. *Pickman*, 545 N.Y.S.2d 369, 371 (2d Dep't 1989); *see also Padula* v. *Big V Supermarkets, Inc.*, 570 N.Y.S.2d 850, 851 (3d Dep't 1991) ("As the situation here was a recurrent one in times of inclement winter weather, an inference could be drawn that defendant had actual knowledge of a recurrent dangerous condition and therefore could be charged with constructive notice of each specific reoccurrence of the condition."). Vicente's deposition clearly demonstrates an awareness of the leaks in the Break Room's ceiling. (*See* Vicente Dep. 13:6-12 ("Q: Prior to December 19, 2016, from time to time, were you called to clean water from this particular Amtrak police officer's break room as a result of a leaky ceiling? … A: Yes."); *see also id.* at 17:19-19:5). And though ABM offers its own interpretation of Vicente's deposition answers (*see* ABM Reply ¶¶ 15-18), the Court cannot conclude as a matter of law that ABM was unaware of a recurrent dangerous condition, and the possible consequences of that condition — items falling from the ceiling.

### 3. A Genuine Dispute of Fact Exists as to Whether ABM's Breach of Duty Caused Plaintiff's Injuries

It is not enough for ABM to have been negligent; Plaintiff must also establish that ABM's failure to notify Amtrak of the dangerous condition in the Break Room, as required by the Services Contract, caused Plaintiff's injuries. Because negligence cannot simply be presumed from the mere existence of an

injury, "where there are several possible causes of injury, for one or more of which defendant is not responsible, plaintiff cannot recover without proving that the injury was sustained wholly or in part by a cause for which defendant was responsible." *J.E.* v. *Beth Israel Hosp.*, 744 N.Y.S.2d 166, 170 (1st Dep't 2002) (internal citations omitted). Accordingly, Plaintiff bears the initial burden of putting forth evidence sufficient to raise a genuine dispute of fact that the accident was caused by ABM's negligent maintenance, and not by some other factor.

While Plaintiff need not exclude every possible cause of the accident, his proof must render "those other causes sufficiently remote or technical to enable a jury to reach its verdict based not upon speculation, but upon the logical inferences to be drawn from the evidence." *J.E.*, 744 N.Y.S.2d at 169 (internal citation and quotation marks omitted); *see also Burgos* v. *Aqueduct Realty Corp.*, 92 N.Y.2d 544, 550 (1998) ("A plaintiff is not required to exclude every other possible cause, but need only offer evidence from which proximate cause may be reasonably inferred. Plaintiff's burden of proof on this issue is satisfied if the possibility of another explanation for the event is sufficiently remote or technical to enable the jury to reach its verdict based not upon speculation, but upon the logical inferences to be drawn from the evidence." (internal citations and quotation marks omitted)).

The Court finds that a genuine dispute of fact exists as to whether ABM's negligence in failing to notify Amtrak of a foreseeable unsafe condition caused Plaintiff's injury. The parties do not dispute that ABM did not place a yellow

caution sign to warn of the condition, as required by the contract (*see* Amtrak 56.1 ¶ 15), or notify Amtrak that the metal bar was on the floor (*see* Amtrak Opp. 6). None of the six different Amtrak station managers on duty at Penn Station received any report from an ABM supervisor about a metal bar on the floor or a leaking ceiling in the Break Room from 7:00 a.m. on Saturday, December 17, 2016, until noon on Monday, December 19, 2016. (*See* ABM Reply ¶¶ 35-36).

Construing the facts in the light most favorable to Plaintiff, ABM's failure to notify Amtrak of that condition was a proximate cause of Plaintiff's injuries. (*See also* Amtrak Opp. 8-9). Amtrak Station Manager Mark Jordan testified that had ABM reported the leak to Amtrak in accordance with its own protocols, Amtrak would have closed off the Break Room and would not have permitted any Amtrak personnel to enter the room until the leak condition was repaired, which would have prevented the accident from happening. (Jordan Dep. 16:18-17:25). Furthermore, the presence of a caution sign would have provided Plaintiff an opportunity to examine his surroundings, and potentially avoid injury. On these facts, proximate cause may be "reasonably inferred." *Burgos*, 92 N.Y.2d at 550. Thus, Plaintiff has identified a genuine dispute of fact that the accident was caused by ABM's negligent performance of its maintenance obligations, and ABM's motion for summary judgment as to liability is denied.

**B.** **Summary Judgment Is Denied as to ABM's Claims Regarding the Indemnification Clause in Its Contract with Amtrak**

Separately, ABM seeks summary judgment in its favor as to any contractual indemnification obligations it might otherwise have to Amtrak arising from Plaintiff's injury. This motion, too, must be denied.

**1. Applicable Law**

"Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Cevasco* v. *Nat'l R.R. Passenger Corp.*, 606 F. Supp. 2d 401, 408 (S.D.N.Y. 2009) (quoting *Hartford Fire Ins. Co.* v. *Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000)).

Here, the parties selected the law of the District of Columbia: "The Contract shall be governed by and construed in accordance with the laws of the District of Columbia, excluding that portion of District of Columbia law relating to the application of laws of another jurisdiction." (Services Contract ¶ 14). ABM does not dispute that District of Columbia law governs this action. No party has identified a relevant conflict between the laws of the District of Columbia and New York. Accordingly, the Court will apply the substantive law of the District of Columbia. *See Cevasco*, 606 F. Supp. 2d at 408.

**2. Analysis**

In its cross-claim, Amtrak alleges that ABM is required to indemnify Amtrak for Plaintiff's claims against Amtrak, on the theory that the claims arose out of ABM's failure to perform obligations in compliance with the Contract. (*See* Amtrak Answer 4; *see also* Amtrak Opp. 8). Indemnification is

available if the contract (or implied contract) allows it, or if equitable considerations so require "to prevent injustice." *R&G Orthopedic Appliances* v. *Curtin*, 596 A.2d 530, 544 (D.C. 1991). "One of the most common, and simple basis of indemnity is a contract that provides for it." *E. Penn Mfg. Co.* v. *Pineda*, 578 A.2d 1113, 1126 (D.C. 1990) (internal citations omitted). Here, the Indemnification Clause of the Contract between ABM and Amtrak provides that ABM "agrees to defend, indemnify and hold harmless Amtrak … from and against any claims, losses, liabilities … which any of the Indemnified Parties may hereafter incur, be responsible for or pay as a result of breach of warranty, injury or death of any person, … as a result of [ABM]'s failure to perform its obligations in compliance with the Contract Documents." (Services Contract ¶ 24.A).

Resolution of this portion of ABM's motion turns on whether Plaintiff's injury arose out of ABM's negligence. ABM argues that the Indemnification Clause is inapplicable because Plaintiff's injuries, if any, were caused exclusively by Amtrak's negligent conduct, specifically from Amtrak's failure to maintain and repair the ceiling in the Break Room. (ABM Reply ¶¶ 11, 46). In this regard, ABM says that there is no proof that it was negligent or that it breached its Contract with Amtrak. (*Id.* at ¶ 46). Thus, according to ABM, Plaintiff's claims have nothing to do with the janitorial maintenance services provided by ABM as Amtrak's contractor.

In response, Amtrak argues that ABM failed to perform obligations in compliance with the Contract, which failure contributed to Plaintiff's injuries.

(*See* Amtrak Opp. 8). It contends that pursuant to the Contract, ABM was required to "police" certain areas, including the Break Room, to ensure that the areas were clean and free of trash. ABM alleges that no ABM employees performed these duties during the First Shift on December 19, 2016, specifically between the hours of 5:00 a.m. and 11:00 a.m. (Amtrak 56.1 ¶ 18). Thus, Amtrak argues, ABM's omissions resulted in potentially hazardous conditions for those who utilized the area. (Amtrak Opp. 5-6, 8).[7]

As discussed above, the Court finds that genuine disputes of fact exist as to whether ABM had notice of any unsafe condition and whether it was negligent in failing to notify Amtrak of such condition. Accordingly, genuine disputes of fact exist as to whether ABM failed to act in compliance with the Contract and, by extension, whether it is contractually obligated to defend and indemnify Amtrak for any losses arising out of Plaintiff's claims. (*See* Amtrak

---

[7]    In addition, Amtrak argues that pursuant to the laws of the District of Columbia, ABM would be required to indemnify Amtrak even for Amtrak's own negligence. (*See* Amtrak Opp. 8). That is, the District of Columbia has found that a party may enter into an agreement requiring indemnification for its own negligence, as long as there is a "clear intention ... from the face of the contract" that indemnification for negligence was contemplated. *Rivers & Bryan, Inc.* v. *HBE Corp.*, 628 A.2d 631, 635 (D.C. 1993). "When the terms of an indemnity agreement are ... broad and comprehensive, the presumption is that if the parties had intended some limitation of the all-embracing language, they would have expressed such limitation." *Id.* at 654 (quoting *Princemont Constr. Corp.* v. *Baltimore & Ohio R.R.*, 131 A.2d 877, 878 (D.C. 1957)) (internal quotation marks omitted). However, indemnity agreements "are narrowly construed by the courts 'so as not to read into [them] any obligations the parties never intended to assume.'" *Rivers & Bryan, Inc.*, 628 A.2d at 635 (quoting *Haynes* v. *Kleinewefers & Lembo Corp.*, 921 F.2d 453, 456 (2d Cir. 1990) (alteration in original)).

The Court rejects Amtrak's argument. The Contract provides that ABM must indemnify Amtrak for any personal injuries "arising out of or in any degree directly or indirectly caused by or resulting from" the "activities of, or Services performed by [ABM]," or "as a result of [ABM]'s failure to perform its obligations in compliance with the Contract Documents." (Services Contract ¶ 15). Unlike the agreement in *Cevasco*, the Contract here is not comprehensive enough to require ABM to indemnify Amtrak for Amtrak's own negligence.

Opp. 8).  Consequently, Amtrak's claim for defense and indemnification against ABM under the contractual indemnification clause survives summary judgment.

**CONCLUSION**

For the reasons discussed in this Opinion, ABM's motion for summary judgment is DENIED in full.  The Clerk of Court is directed to terminate the motion at Docket Entry 79.

The parties are to submit a joint letter on or before August 19, 2019, in which they set are to set forth their availability for trial in the second quarter of 2020, to request an alternative dispute resolution mechanism, and/or to propose an alternative path forward for resolution of this case.

SO ORDERED.

Dated:　　　August 2, 2019
　　　　　　New York, New York

　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　KATHERINE POLK FAILLA
　　　　　　　　　　　　　　　　　　　United States District Judge